# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs February 29, 2012

## STATE OF TENNESSEE v. JONATHAN CURTIS AUSTIN

**Direct Appeal from the Criminal Court for Greene County**
**No. 11CR063     John F. Dugger, Jr., Judge**

---

**No. E2011-01389-CCA-R3-CD - Filed August 30, 2012**

---

Defendant, Jonathan Austin, was indicted by the Greene County Grand Jury for one count of aggravated assault, a Class C felony. Following a jury trial, Defendant was convicted as charged. On appeal, Defendant argues that the evidence at trial was insufficient to support his conviction. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Paul Whetstone, Morristown, Tennessee, for appellant, Jonathan Curtis Austin.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Greg W. Eichelman, District Attorney General; Ritchie Collins, Assistant District Attorney General; and Cecil Mills, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

On August 25, 2010, Adam Arrington, with the Third Judicial Drug Task Force, was conducting a controlled purchase of "pills" with confidential informant Kara Short. Agent Arrington searched Ms. Short, gave her money for the purchase, and "wired" her with two audio recorders. Ms. Short then called Katie Griffin and arranged to meet her in the parking lot of a store to buy the pills. Ms. Griffin "was going to be a middle man." Agent Arrington watched Ms. Short get into a vehicle with Ms. Griffin, and Ms. Griffin drove to a driveway

approximately 20 feet from the intersection of Old Knoxville Highway and Ely Road. As they drove away, Agent Arrington "lost communication with the informant" and could no longer hear the audio. He testified that he was not concerned because "[he] could call them on the telephone if [he] needed to talk to her or she thought something was wrong she could have called [him]." Agent Arrington followed them and parked on Ely Road to "monitor the situation." As he drove past, he saw Defendant standing beside Ms. Griffin near the driver's side of Ms. Griffin's vehicle. He testified that Defendant's back was to him, and as he drove by, he got "a real quick look." Agent Arrington testified that "it looked like a drug deal," and he continued driving to the next road on the right, where he parked and waited a "few moments" before he drove back toward the intersection. He saw Ms. Griffin's vehicle driving toward the store where Ms. Griffin had picked up Ms. Short, and he drove back to the meeting place to wait for Ms. Short.

When Ms. Short arrived, she was crying and distraught and "physically shaken." Agent Arrington had to light Ms. Short's cigarette because she was shaking so badly. He reassured her that she was safe, and after approximately 25 minutes and "three or four cigarettes later," Ms. Short gave a statement to Agent Arrington. In her statement, Ms. Short wrote:

> [Katie Griffin] called [Defendant] and he couldn't get a ride so we went to his house[.] Katie got out of the car [and] handed him the money. [Defendant] pulled out a gun[,] pointed it at Katie[,] and told us to get out of there. I saw the gun so we left. It was a black revolver. She took me back to my truck at the store and I met back with [Drug Task Force Agents].

In another statement, Ms. Short wrote, "I was afraid for my life when I was with Katie [Griffin] and [Defendant] pulled a revolver on Katie and pointed it at me." Agent Arrington did not see Defendant holding a gun. Agent Arrington testified, "When I was coming around the curve on the old Knoxville Highway and seen [sic] them standing over there, it appeared to me nothing more than they're buying pills. The same way it's looked every other time."

Bobby Daniel Ely testified that he was a dairy farmer in Mosheim, and Defendant worked for him. Mr. Ely testified that he carried a gun, a .38 revolver, with him to the milk barn for protection. He kept the gun in a "gun bag" on the table, and he "just carried it out as [he went] and lay it in the truck, and when back in the house [he] laid it back on the table."

On August 25, 2010, while he and Defendant were working on the property, Ms. Griffin text messaged Mr. Ely and asked him to participate in "[a] fake robbery." She asked him to "pull a gun on somebody and take money from them." Mr. Ely refused and "went on working and didn't thin[k] anymore of it." Defendant was with Mr. Ely when he received

-2-

the call. Defendant asked Mr. Ely if he was going to do it, and Mr. Ely said, "no." Defendant said, "I will if you don't want to." Mr. Ely continued working, and Defendant worked with him. Then, Defendant "disappeared for about fifteen, twenty minutes there, once." When Defendant returned, Mr. Ely asked where he had been and Defendant told him that "he went and helped with the fake robbery and [Defendant] said, 'I put your gun back in the truck.'" Mr. Ely did not see what happened. They continued working until "milking time," when Mr. Ely drove Defendant to the feed store to meet "Katie and Tony." Mr. Ely did not hear their conversation. Later that evening, Defendant gave Mr. Ely one hundred dollars. Mr. Ely testified that Defendant "owed [him] money on a car [he] had loaned him."

At approximately 1:30 a.m., Mr. Ely spoke to Agent Arrington, who wrote a statement for Mr. Ely and read it to him because Mr. Ely does not read very well. Mr. Ely testified that Agent Arrington had written that Mr. Ely gave a gun to Defendant; however, Mr. Ely asked Agent Arrington to correct the statement because he did not give Defendant a gun.

Kara Short testified that she was working as a confidential informant for the Drug Task Force on August 25, 2010. Her code name as a confidential informant was Romeo Cox. She met with Agent Arrington and Kim Davis, and she was wired with an audio recorder and given one hundred dollars to purchase drugs. She then drove to meet Katie Griffin. Ms. Short got into Ms. Griffin's vehicle, and they drove to a location where Ms. Short believed they were going to buy drugs.

Ms. Short testified that when they drove to meet Defendant, Defendant was standing beside the road. Ms. Short gave Ms. Griffin the money, and Ms. Griffin got out of the vehicle. Ms. Short testified, "[Defendant] started to get loud, and when I looked out the window he had a gun in his hand." Defendant pointed the gun at them and shouted at them to "get out of here." Ms. Griffin got into the vehicle, and they drove away.

The following was recorded:

Defendant: What the f[ ]. Get the f[ ] out of here. Who the f[ ] you got up here? I'll f[ ]ing blow your goddamn brains out. You don't bring mother f[ ]ers up here like that. What the f[ ]?

Ms. Griffin: Dude, Jonathan, what the f[ ] is that?

Defendant: Go back home.

Ms. Short: What the hell?

Ms. Griffin: [ ]damn.

Ms. Short: What the f[ ] is his problem?

Ms. Griffin: They . . . oh.

Ms. Short: I thought you said it was okay.

Ms. Griffin: He told me it was. Holy f[ ]. I'm going to have a f[ ]ing heart attack. I have never had a f[ ]ing gun pulled on me Kara.

Ms. Short: Does he have my money?

Ms. Griffin: Yeah.

Ms. Short: He's got my money.

Ms. Griffin: Yeah.

Ms. Short: And he pulled a f[ ]ing gun on you.

Ms. Griffin: Yeah. Oh my god.

Ms. Short: That's f[ ]ed up. Now I am going to have to pay this dude back.

Ms. Griffin: No, you're not. I will.

Ms. Short: [ ]damn it, dude.

Ms. Griffin: Dude, he cocked that mother f[ ]er and everything. He was serious, wasn't he?

Ms. Short: Yeah, and he sure did have a f[ ]ing gun, dude.

Ms. Griffin: Oh my.

Ms. Short: This is twice in a row. This is bull[ ]. I'm gonna go to the [ ]damn house. I am not going to f[ ]ing move.

Ms. Griffin:   I've got the money back at the house to pay you back, Kara.
               F[ ] I'd rather pay somebody back than get my [ ]damn brains
               blowed out.

Ms. Short:     I see you on that one.

Ms. Griffin:   You know that black truck right there has been following us.
               It went the other way.  They was at the store.  Wonder what
               the hell is up with that?

Ms. Short:     Your guess is as good as mine.

Ms. Griffin:   Huh?

Ms. Short:     I said your guess is as good as mine.  I have to f[ ]ing text
               him and tell him I lost his [ ]damn money.

               Now I ain't never gonna get my car out of impound.
               [Phone ringing]

               Hello?  Yeah, I'm coming home, but guess what?  Dude
               pulled a gun on us.  No, I'm not kidding.  He had a f[ ]ing
               gun in his hand and cocked it and all.

Ms. Griffin:   Stuck it right in my face.

Ms. Short:     Stuck it right in Katie's face.  Yeah, we're okay.  Okay.
               Alright.  Bye.

They returned to the store where Ms. Short left her truck.  After Ms. Short walked away from Ms. Griffin, Ms. Short got back inside her vehicle and said, "Great.  I can't believe that mother f[ ]er pulled a f[ ]ing gun.  A f[ ]ing gun.  A big black gun.  And I'll show you where that mother f[ ]er lives.  That is some crazy bullsh[ ]."  Ms. Short believed she "was getting robbed."  She thought that Agent Arrington could hear the exchange and expected him to help her.  When Ms. Short returned to the meeting place where the agents were, she was shaking.  She told the agents that Defendant pointed the gun in her "general direction."  Ms. Short has not acted as a confidential informant since the incident.  She testified, "That was it for me . . . I'm not doing that.  I'm not putting my life in danger like that."  Ms. Short did not know that Ms. Griffin was involved in planning the incident.  She testified that she asked Ms. Griffin if Defendant had pulled a gun on her because she thought

-5-

that the Drug Task Force agents were listening to her. She wanted the agents to hear her say that there was a gun.

Katie Griffin testified that on August 25, 2010, Ms. Short called her, "asking to purchase some Roxycodones." Ms. Griffin "made a couple of phone calls" and met up with Ms. Short. They drove to a gas station, but "no one showed up." She called Mr. Ely and asked if he had any pills, and he said yes. As she drove to Mr. Ely's property, she noticed a truck that looked "suspicious," and she "got scared." She "sent a text message to them telling them that [she] was worried about the deal and when [she] got there to act like they were robbing [her]." When they arrived, Ms. Griffin stepped out of her car and handed Defendant a one hundred dollar bill. Defendant "pulled the gun out of his waist and pointed it at me and started screaming and going on." She testified that she got back into her car, and Ms. Short asked, "What the f[ ] is going on? Did he just pull a gun on you?" Ms. Griffin testified that she set up the fake robbery "to just get the money where [she] was strung out on drugs." She testified that she "got scared and didn't want to do it but [she] went and done it anyway."

Ms. Griffin acknowledged that she did not know whether Ms. Short had seen the gun; she testified, however, "I don't think the girl is going to lie about seeing the gun, though." She testified that when she got back inside her car, Defendant "still had the gun out. There is a very good possibility that she did see that gun."

Defendant testified that he was 29 years old and had completed tenth grade. He testified that he "worked [his] entire life." He began working at age nine cleaning up at roofing jobs with his father, and he had worked various jobs since then. Defendant denied ever having sold drugs. Defendant began working at Mr. Ely's dairy farm two or three months before this incident. Defendant testified that he had met Ms. Griffin one time prior to this incident. He went to her apartment with Mr. Ely, and Ms. Griffin "was doing him favors for the pills."

On August 25, 2010, Defendant was working for Mr. Ely. Mr. Ely told Defendant that Ms. Griffin had called him and told him that she wanted "to make it look like he robbed her," and Mr. Ely asked Defendant if he would do it for him. Defendant testified, "Foolishly, I said yes." Defendant testified that Mr. Ely gave him the pistol out of his truck. Defendant and Mr. Ely stood beside Mr. Ely's truck and waited for Ms. Griffin to arrive. When they saw her, Mr. Ely told Defendant to meet her at the end of the driveway. Defendant admitted that it was his voice on the audio recording. Defendant testified that the gun was in his waistband and that his shirt was covering it. Ms. Griffin got out of her car and handed Defendant the money. Defendant testified that Ms. Griffin "wanted [him] to tell her to get out of [there] because of the woman in the car." Defendant testified that he pulled his shirt

up to reveal the gun, but he "never pulled the gun out of [his] waist, never." Defendant testified that he could not see Ms. Short, and he was "trying to stay out of sight of everybody." Defendant gave Mr. Ely the one hundred dollar bill that Ms. Griffin gave him. He testified that he participated in the fake robbery because Mr. Ely asked him to do it.

Officer Kenny Carter testified that he had sworn out a warrant against Ms. Griffin. In his affidavit, Officer Carter stated that on March 20, 2011, Ms. Griffin called the police and reported that someone was breaking into her apartment, but she was not at her apartment. An investigation revealed that Ms. Griffin had been in the apartment, and she reported a burglary "due to [a] dispute over clothing involving Christie Phipps." The affidavit also stated that Ms. Griffin had "further misled police stating that Stacey Shelton was not inside the apartment. Shelton was found hiding in a closet due to an outstanding violation of probation." Ms. Griffin was charged with a felony and later pled guilty to disorderly conduct, a misdemeanor.

Joann Bowman testified that Defendant's sister was married to her son, and she had known Defendant for 16 years. She testified that she believed Defendant was an honest person.

*Analysis*

On appeal, Defendant asserts that the evidence at trial was insufficient to support his conviction for aggravated assault. Specifically, Defendant argues that "the only reasonable conclusion" based on the evidence is that Ms. Short did not see a gun, and consequently, she could not have been in fear. Therefore, Defendant contends, the State failed to prove an element of the offense.

Our standard of review regarding sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id*. (citation

omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S .W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id*. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. *Id*.

A person commits aggravated assault when he or she knowingly commits an assault and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii). A person commits assault when he or she knowingly causes another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(2).

In a light most favorable to the State, the evidence at trial established that Ms. Short, acting as a confidential informant, and Ms. Griffin met Defendant to purchase drugs. When they arrived, Ms. Griffin stepped out of her vehicle, and Defendant began yelling at her. Defendant pulled out a gun and pointed at Ms. Griffin. Ms. Short, who remained inside the vehicle, saw the gun in Defendant's hand. She testified that she saw the barrel and "the revolver part." She testified that Defendant pointed the gun in her "general direction . . . enough for [her] to know what the gun looked like and see the tip of the barrel, like [her] eyes were looking into it." After the incident, Ms. Short was visibly shaken and upset.

Defendant asserts that Ms. Short's testimony at trial that she saw the gun should not be believed because it "emanated from the vocal apparatus of one who made a living by assuming a false identity under false pretenses, [and] is beset with an abundance of counterveiling proof." Defendant attempts to discredit Ms. Short based on the audio recording, in which she stated, "And he pulled a f[ ]ing fun on you?" Defendant contends that the audio recording makes it obvious that Ms. Short did not see a gun and was not in fear. Ms. Short testified at trial, however, that she believed the Drug Task Force agents could still hear her, and she wanted them to hear her say that there was a gun. Ms. Short is also heard saying, "Yeah, and he sure did have a f[ ]ing gun, dude." Then, she described the gun as a "big black gun" although Ms. Griffin had not mentioned the color or type of gun.

In his argument, Defendant relies upon facts which were placed before the jury. His argument is essentially nothing more than a challenge to the weight and credibility of the evidence admitted. All of this evidence was put before the jury at trial through the presentation of witnesses, exhibits, and cross-examination by the defense. It is the jury's responsibility to determine the credibility of the witnesses and the weight to be given their testimony. This Court will not reweigh the evidence or substitute its inferences for those of

the trier of fact. The jury in this case heard the testimony of all witnesses and viewed and/or listened to the exhibits. Based on the jury's verdict, the jury accredited the testimony of the State's witnesses and rejected the defendant's claim. Defendant is not entitled to relief.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE